FILED
U.S. DISTRICT COURT
SAV. DIV.
2006 MAR 17 PM 3:21
*illegible signature*
SCUT. DIST. OF GA.

DELLA STEELE, GEORGIA BENTON, )
CHARLES ROBERTS, JUDY )
ROBERTS, WILBERT HURST, and )
GLENN STEELE, on behalf of )
themselves and all others )
similarly situated; and the )
NORTH PORT WENTWORTH CITIZENS )
COUNCIL, INC., )     CASE NO. CV405-135
)
     Plaintiffs, )
)
v. )
)
CITY OF PORT WENTWORTH, )
GEORGIA, )
)
     Defendant. )
)

## O R D E R

Before the Court is Defendant City of Port Wentworth's
Motion for Summary Judgment. (Doc. 38.) For the reasons
the follow, the Motion is **GRANTED**. In addition,
Defendant's Motion to Strike (Doc. 70) is **DENIED AS MOOT.**
Plaintiffs' Request for Oral Argument (Doc. 83) is **DENIED.**

## I.   BACKGROUND[1]

Plaintiffs in this case – six individuals and a
nonprofit organization – allege that the City of Port

---

[1] On a motion for summary judgment, the facts must be viewed
in the light most favorable to the nonmoving party.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538
(1986).

Wentworth, Georgia ("the City") has engaged in a pattern of racial discrimination through its failure to provide equal municipal services to African-American residents.[2] Primarily, Plaintiffs allege that the City has denied water, sewer, and drainage services to African-American residents on the basis of race. In addition, they allege that the City has allowed white residents to block a public road, denying several African-American residents equal access to their properties.

The named Plaintiffs reside on Berrien, Saussy, and Montieth Roads in the northern part of Port Wentworth. Plaintiff North Port Wentworth Citizens Council, Inc. ("NPWCC") is a nonprofit organization that seeks to promote the interests of African-American communities and residents in Port Wentworth.

Below is a history of the City's relationship with the African-American communities along Berrien and Saussy Roads and, to a lesser extent, Montieth Road. Part A describes the City's annexation of the area and its preparation of a master plan for future development (the "Master Plan"). Part B discusses water and sewer extensions to the area and

---

[2] The Complaint states that Plaintiffs intend to bring these claims as a class action. Because Plaintiffs have not moved to certify a class at this time, the Court shall consider the merits of Plaintiffs' individual claims.

the City's offer of water and sewer to Berrien and Saussy Roads in 2001. Parts C and D summarize the water and sewer extensions provided to predominately white communities and the offer of water service, but not sewer, to Montieth Road in 2003. Finally, Parts E and F set forth the facts regarding drainage services and the alleged blockage of Jeffers/Colbrook Road.[3]

### A.   Annexation and the Master Plan

In 1989, the City annexed an approximately twenty-square-mile area now commonly known as North Port Wentworth. Almost all of the land in the annexed area was privately owned timberland. At the time of annexation, the area was largely uninhabited, with the exception of the two predominately African-American communities, Berrien/Saussy and Montieth, and a predominately white subdivision, Pine Forest. Pine Forest had a private water and sewer system. In contrast, the predominantly African-American communities of Berrien/Saussy and Montieth relied on deep wells and septic tanks.

In the late 1990s, the City began developing its Master Plan for future development of the annexed area.

---

[3] The City refers to the road at issue as "Jeffers Road." Plaintiffs refer to it as "Colbrook Road." For purposes of this Order, the name of the road is immaterial, and the Court will refer to it as Jeffers/Colbrook Road.

The City wished to encourage and control development of North Port Wentworth for many reasons: to address the undesirable consequences of a population decline, including declining property values; to provide a residential area further from the ongoing industrial development near the Port of Savannah for new residents and core City transplants; to address the fear of City leaders that Port Wentworth would eventually be swallowed up by the Port and by the City of Savannah; and to prevent haphazard development of the area. The City hired engineers and planners to work on the Master Plan, and they held a series of public hearings and town hall meetings.

The Master Plan resulted in the creation of a zoning overlay district to guide future development. It sought to incorporate elements of "new urbanism," such as grid street patterns, sidewalks, trees, neighborhood parks, and housing options diverse in both price and type. One part of the master planning process was to perform an overall wetlands delineation to guide future development onto high ground. Wetlands, drainage canals, and retention ponds would occupy lower ground. The zoning and wetlands delineation would simplify and expedite permitting for new development.

For several reasons, Plaintiffs viewed the Master Plan as a process that would eliminate their communities.

4

First, the City did not consider existing land use in its initial planning stages. (Rutherford Dep. at 71.) The City Administrator at the time of the planning process, David Rutherford, acknowledges this in his deposition, stating that "[i]f you start making decisions based on who lives here, who owns that, or what else, and you start doing that, and then the planning process gets tainted." (Id. at 70.) Because their communities were not incorporated into the initial planning process, Plaintiffs feared that they would be forced leave.

Second, the Master Plan originally zoned the land along the Berrien and Saussy Roads for commercial development. (Grabowski Dep. at 116). Plaintiffs saw the commercial zoning as a sign that the City planned to convert their neighborhoods to commercial areas. The Master Plan was later revised to show that these communities would remain single-family residential. (Id. at 129-130.)

Third, maps of the zoning overlay districts showed frontage roads, retention ponds, and wetlands on land currently inhabited by some African-Americans citizens on Berrien and Saussy Roads. (Grabowski Dep. at 105-106 & Ex. 44.) An overlay map illustrates that the Master Plan envisioned that these roads would cease to exist in their

current form.  (Id.)  The African-American residents in the Berrien/Saussy community complained at several City Council meetings and wrote letters to the City stating that the overlay district would displace the African-American community.

Fourth, the Berrien/Saussy neighborhood was the only existing community affected by Phase One of the planning process.  The Phase One area encompassed approximately 2,000 acres of uninhabited land and 100 acres of land owned by African-American residents in the Berrien/Saussy community.  The other existing community in the annexed area, the predominately white Pine Forest, was not included in the Phase One area.[4]  (Grabowski Dep., Ex . 45.)

A major factor contributing to Plaintiffs' mistrust of the City's intentions was the condemnation of the Grange Road neighborhood around this time.  Grange Road was one of the few African-American communities within the original city limits of Port Wentworth.  Concurrent with the culmination of the master planning process, in 2000 or 2001, parts of Grange Road were condemned by the Georgia Ports Authority to make way for the expansion of the Port

---

[4] Pine Forest was in the area affected by Phase Two of the Master Plan.  Plaintiffs offer no evidence of whether the existing land use for the Pine Forest community was considered in the planning process.

of Savannah.  Given the encroaching industrialization, the remaining residents on Grange Road also chose to leave. (Young. Dep. at 57-58.)  The African-American residents in North Port Wentworth expressed their fear that their properties would be condemned, or that they would be forced to sell, like the African-American residents on Grange Road.

The City took some steps to alleviate Plaintiffs' concerns that their communities were to be displaced.  It held public meetings to receive feedback.  (Grabowski Dep. at 63; Gary Aff., Ex. 3 at 118-121.)  The City also explained that the Ports Authority, not the City, had condemned Grange Road, and that the City had played no role in displacing that community.  (Gary Aff., Ex. 3 at 116.) The City provided informational literature stating that landowners could choose whether and when to sell property to make way for any future development.  (Id.)  With respect to Berrien and Saussy Roads, then-City Planner Denise Grabowski states:

> We proposed to take [Berrien and Saussy Roads] out of the master plan, and they responded that they did not want to be ignored and left out, but they wanted to be able to continue to live there, and so we clearly identified in the master plan the existing residential streets and that those would remain as residential use and also clearly stated that the residential use could remain

> through an ordinance that was passed by the city
> council.

(Grabowski Dep. at 130.)  The City also worked with NPWCC to create a park around the cemetery at historic Richmond Church in the Berrien/Saussy neighborhood, to protect the cemetery and to prevent the church from being swallowed up by any future widening of Highway 21.  (Id. at 107-108.) Plaintiffs acknowledge that the City stated that it was not seeking to condemn or take away anyone's land.

Plaintiffs contend, however, that they received mixed messages about whether the overlay district's depiction of roads and retention ponds on land already inhabited African-Americans meant that the City intended to condemn or otherwise force the residents to sell their land. Denise Grabowski, then City planner, stated at a City council meeting that "There are mechanisms the City can go through if property owners do not want to sell their property."  (Gary Aff., Ex. 3 at 120).  Ms. Grabowski also authored an article about the City's Master Plan, for a planning association conference, entitled "Building a Town When You Don't Own the Land."  (Grabowski Dep., Ex. 45). Plaintiffs interpreted these and other statements by City

officials as a signal that the City was planning to eliminate the African-American residential areas.[5]

In 2000, the City hired an engineering firm to perform surveys for the master wetlands delineation. Plaintiff Georgia Benton complained to the City when surveying was performed on or around her property on Saussy Road.

The Master Plan was implemented when the City Council adopted the zoning overlay. Current development is following the Master Plan, including an ongoing development called Rice Hope in the Phase Two area. New development will also be required to follow the Master Plan. (Grabowski Dep. at 79.) There is no timeline for development, because the Master Plan is based on private market forces, with development to occur on private land in accordance with the wishes of private landowners and private developers. The City envisions that development may occur within the next 20 years. Much of the Phase One area has not begun developing, because several large landowners - specifically one family - have not yet decided to sell or begin development. (Id. at 94-96.)

---

[5] The City offers different interpretations of these comments (for example, that the Master Plan could be revised to incorporate current residents and landowners).

## B.  Water and Sewer for Berrien and Saussy Roads

The evidence shows that Berrien/Saussy and Montieth are among the only neighborhoods in the City that lack access to City sewer and/or water. Tommy Thomas, the former Director of Public Works, testified that the only neighborhoods in Port Wentworth that do not have access to sewer are Berrien/Saussy, Montieth, Grange, and Meinhard. (Thomas Dep. at 43.) Of these areas, the first two are the African-American neighborhoods involved in this case; Grange was formerly African-American until it was converted to industrial; and only Meinhard is predominately white. Mr. Ford, a supervisor at Public Works, testified as to several other predominately white communities without City water and sewer: Flonell Drive, Highway 30, and portions of Pleasant Drive, Keller Road, and Punkin Bridge Road. (Ford Dep. at 38.) Although Plaintiffs have offered no statistical evidence, the evidence suggests that the vast majority of white residents, mostly concentrated in the core City, have access to city water and sewer. With the exception of water service offered to Montieth Road, the Plaintiffs' neighborhoods do not have water or sewer services.

## 1.  Water and Sewer Extensions

To facilitate development in accordance with the Master Plan, the City began constructing water and sewer lines to the northern part of Port Wentworth in 2000. (Pls.' St. Facts ¶ 2.)  The water and sewer mains were extended down the power line right-of-way to the edge of Berrien and Saussy Roads.  City Council member E.L. Young testified:

> In 2000, when we ran water and sewer up there to accommodate what we hoped would be the master plan, we stopped the water and sewer line at Saussy Road in anticipation of hooking on there for the master plan area and also to run water and sewer down Saussy and Berrien Road right before it and to the end of it.

(Young Dep. at 63; see also Ford Dep. at 49-51; Thomas Dep. at 35 ("When we ran the major transmission line down the power line [around 2000], that is the 24-inch major transmission line, and once that was completed, according to construction plans, we were to go down Berrien and Saussy Road."))  The City's engineering firm, Hussey, Gay, Bell & DeYoung, Inc. ("HGBD"), prepared plans for water and sewer extension to Berrien and Saussy Roads in 2000 and early 2001.  (Askeland Dep., Ex. 50-53 (plans dated May 11, 2000, November 15, 2000, and January 5, 2001.))

On March 8, 2001, at a public hearing regarding Phase One of the Master Plan, Plaintiff Georgia Benton again

complained, this time about thirteen sewage containers and gravel that had been placed on her property without her consent. (Gary Aff., Ex. 3 at 119-120.) The City had not informed residents of any plan to extend water and sewer to Berrien and Saussy Roads, and Ms. Benton believed that these construction materials were for the implementation of the Master Plan. She expressed opposition to a Master Plan that contemplated replacing her home with a retention pond, and she voiced her fear that the City would take her property for that purpose. When Mayor John Hinely said that the City would not take her land and that it would be her decision whether to sell, she responded, "then why am I looking at over 13 manholes and storm drains and gravel right by my driveway?" (Gary Aff., Ex. 3 at 121.)

After Ms. Benton complained about the construction materials on her property, HGBD performed surveys in the area, purportedly related to water and sewer expansion. (Gary Aff. Ex. 3 at 64-66.) On May 9, 2001, Ms. Benton wrote a letter to the engineers stating that they did not have her consent to survey her property for the Master Plan or for a wetlands delineation. (Gary Aff., Ex. 3 at 72.)[6]

---

[6] Ms. Benton later sued the City because of the materials placed on and around her property. This lawsuit resulted in a judgment in favor of the City in the Superior Court of Chatham County.

The City contends that the materials placed on and around Ms. Benton's property were for the purpose of extending water and sewer to Saussy Road. According to Councilman Young and Tommy Thomas, the former City Director of Public Works:

> As we began which was (sic) on Saussy Road, started to lay out our construction equipment and materials, a manhole and pile of rock was placed over on the backside of the ditch and at this point, there was an objection by Mrs. Benton that we had placed construction material on her property without her permission.

(Thomas Dep. at 35-36.)

> [I]t was determined that there was no deed ever drawn up for Saussy Road, so we felt that [the City] did not own Saussy Road, so we needed to have a deed for a right-of-way to include the road, the water on one side and the sewer on the other side.

(Young Dep. at 64-65.)

> So at this point with the engineering staff, [and] the construction company, we did not feel that it was in our interest to continue if we were encroaching on someone's private property, so at this point in time, it was a joint decision, let's make a determination where we have legal access and where we do not because we do not wish to trespass, so that's when everything got stopped. . . . The only information I got back through the administrator was that apparently we did not have a 60-foot right-of-way in that area and that what we thought we had, we actually did not have.

(Thomas Dep. at 36-37.)

### 2. The Offer of Water and Sewer to Berrien and Saussy Roads in 2001

On May 21, 2001, the City sent a letter to residents on Berrien and Saussy Roads with an offer to provide water and sewer service in exchange for a 60-foot right-of-way. Plaintiffs contend that these terms were "more onerous" than the terms offered to predominately white communities. Plaintiffs also contend that the terms were so unreasonable that the offer was "illusory."

The May 21, 2001 letter stated that it was offering water and sewer to all households "at no charge to the residents." (Gary Aff. Ex. 3 at 35-37.) In exchange, the offer imposed three requirements on the landowners and residents: (1) landowners must all agree; (2) landowners on both sides of the road must donate a 30-foot right-of-way deed to the City, measured from the center of the road (for a 60-foot total right-of-way); and (3) residents must pay the monthly service charge after service began. Each property owner was asked to check either "Yes" or "No" on the accompanying form. The May 21 letter also scheduled a public meeting for June 5, 2001 and gave the residents a deadline of June 15, 2001 to respond to the offer.

Plaintiffs viewed the City's request for a donated right-of-way as being connected to a Master Plan that

sought to eliminate their community. In addition, several residents were concerned because a 60-foot right-of-way would impact structures on their property. All of the residents therefore responded "No" to the City's offer. (Gary Aff., Ex. 3 at 714.)

On August 25, 2001, the NPWCC made a counter proposal to the City on behalf of the residents on Berrien and Saussy Roads. The residents requested water and sewer. They stated that Berrien and Saussy Roads were already 30-feet wide ("wide enough") and that no additional easement should be necessary. They offered to pay a $50 "connection fee, the same as Pine Forest Subdivision." They asked for a response before the September 13, 2001 City Council meeting. (Gary Aff., Ex. 3 at 926-27.)

At the September 13, 2001 City Council meeting, Plaintiff Benton asked about the status of water and sewer for Berrien and Saussy Roads. City Council members stated that all of the residents had opposed the water and sewer extension. The City Council expressed no willingness to work with the residents. (Gary Aff., Ex. 3 at 712-715.)

On January 3, 2002, the engineering firm, HGBD, issued a change order cancelling the water and sewer for Berrien and Saussy Roads. The change order was approved by City Administrator Claxton on February 6, 2002. (Gary Aff., Ex.

4 at 195.) The City also cancelled a portion of a funding loan from the Georgia Environmental Facilities Authority ("GEFA"). (Holbrook Dep. at 76-77; Claxton Dep. at 71-72.)[7] Money received from the State Government was spent on other projects. (R. Thomas Aff. ¶ 8.)[8] These were the last formal actions taken with respect to water and sewer for Berrien and Saussy Roads.[9]

---

[7] The City applied for a $2.7 million loan from GEFA in December of 1999. The loan application states that the funds were for the extension of water and sewer services to new developments in the northern part of the City. The application does not mention any specific communities. (Gary Aff., Ex. 4 at 241-246.)

[8] Plaintiffs have provided an affidavit from State Senator Regina Thomas regarding funds appropriated by the State of Georgia. (Doc. 62, Ex. 19.) Senator Thomas states that she and Representative Ron Stephens requested a special appropriation in 2000 and that Governor Roy Barnes (and the General Assembly) appropriated $150,000 in funds specifically earmarked for the installation of water and sewer on Berrien, Saussy, and Montieth Roads. (R. Thomas Aff. ¶ 8.) The City has moved to strike this affidavit on the grounds that Senator Thomas was not identified by Plaintiffs during discovery. The Court has considered this evidence in deciding that the City is entitled to summary judgment. Therefore, the Motion to Strike her affidavit is **DENIED AS MOOT.**

In response, the City has offered the affidavit of Representative Ron Stephens. (Stephens Aff., Doc. 89, Ex. 2.) Representative Stephens states that the money was not "specifically earmarked" for water and sewer. (Stephens Aff. ¶ 3.) House Bill 1162 appropriated $150,000 to the City of Port Wentworth to "Promote tourism. . .including land acquisition, improvements and other capital outlay or development costs." H.B. 1162, Georgia Laws 2000 at 363.

[9] According to Tim Holbrook, Mayor of Port Wentworth from 2002-2006, he spoke to Plaintiff Steele and others sometime between 2002 and 2004. He states that he made them a proposal where the residents would not have to give up a

Also around this time, the City was nearing completion of water and sewer extension projects to North Port Wentworth, with progress in the Pine Forest subdivision. (Gary Aff., Ex 3 at 716.)

### 3. The 60-foot Right-of-Way Requirement

With respect to the City's offer of water and sewer, there is a significant dispute about the amount of space that is "sufficient" to place water and sewer lines along Berrien and Saussy Roads. The 60-foot right-of-way sought by the City was more than the amount designated in HGBD's 2000 and 2001 engineering plans for the extension. The engineering plans for Berrien Road show a 25-foot right-of-way with a 10-foot temporary construction easement. (Vicevich Dep., Ex 63-64.) There was a 30-foot planned right-of-way for Saussy Road. (Vaughn Dep. at 61-62.) These drawings contemplate that the lines would be installed under the roadway. (Askeland Dep. at 61; Gary Aff., Ex. 3 at 35-36.)

Berrien and Saussy Roads are "extremely narrow," (Vaughn Dep. at 55), "almost like one lane," (Hinely Dep. at 58), and with only about 12 feet of existing pavement

right-of-way, but would instead grant a 60-foot utility easement, giving the City the right to install and maintain infrastructure. According to Holbrook, they told him that they would check with the neighbors but then did not respond to his offer. (Holbrook Dep. at 46-48, 73-75.)

(Thomas Dep. at 42; Gary Aff., Ex. 2 at D00120). For this reason, a 60-foot right-of-way would be substantially more than the size of the roads. (Hinely Dep. at 59.) Several residents stated that a 60-foot right-of-way would extend into parts of their garages. (Young Dep. at 69; Gary Aff., Ex. 3 at 694.) Plaintiff's engineering expert, Robert Vicevich, stated that because of the historic character, the shading, and the closeness of the houses, clearing for a 60-foot right-of-way would destroy the nature of the community. (Vicevich Dep. at 63.)

Every expert in this case agreed that the original engineering plans – to install water and sewer under the road with a 25-foot right-of-way and 10-foot temporary construction easement – were "feasible" for construction. (Askeland Dep. at 61-62; Vaughn Dep. at 68; Vicevich Dep. at 48 & Ex. 63). However, the experts also agreed that a 60-foot right-of-way would be preferable, so that the lines could be installed outside of the pavement and so that the City could preserve street access during construction. (Askeland Dep. at 63; Vaughn Dep. at 68; Vicevich at 55-56.) Defense experts testified that a 60-foot right-of-way is consistent with the requirements of governmental entities in this geographical area. (Vaughn Dep. at 127.) A Port Wentworth zoning ordinance provides for 60-foot

minimum right-of-way for "minor streets." (Vaughn Dep. at 78.) But Plaintiff's expert stated that, in his experience, the typical right-of-way ranges from 32 to 50 feet. (Vicevich Dep. at 54-55, 59.)

Because the annexed area was mostly uninhabited, there are no comparable existing neighborhoods in Port Wentworth. Plaintiffs have not shown that the City provided water and sewer to any other existing neighborhood without requiring a 60-foot right-of-way.[10] However, the City has not demonstrated any other existing neighborhoods where it required residents to donate a 60-foot right-of-way before installing water and sewer lines. (See Claxton Dep. at 73-76 (describing three new developments where 60-foot easements were incorporated into initial construction).)

### C.   Montieth Road

In March 2003, the City offered water service, but not sewer, to Plaintiffs residing on Montieth Road. (Compl. ¶ 32; Def.'s Br., Doc. 42 at 8.) Montieth Road is a predominately African-American street. Plaintiffs contend that the City's offer was on more onerous terms than those offered to comparable white residents, and they contend that the City discriminated by not offering sewer service.

---

[10] As explained below, the Pine Forest subdivision also represented a unique set of circumstances.

The City already had an existing 60-foot right-of-way for Montieth Road, so the right-of-way was not an issue. (Claxton Dep. at 100.) The City installed the water along this existing right-of-way.

Only three residents in the Montieth community connected to the water line. Plaintiffs claim that residents did not connect because the offer from the City included deposit fees of several hundred dollars above the deposit fees required of Pine Forest Residents. Plaintiff Wilbert Hurst, a Montieth resident, testified that the City sought to charge him $300 for a water meter, plus a $100 deposit, and that he would have had to hire a plumber to connect his own line. (Hurst Dep. at 18-19.) In contrast, Plaintiffs present evidence that Pine Forest residents were charged only a $50 deposit for connection to water and sewer service. (Gary Aff., Ex. 3 at 663). Pine Forest residents also may not have been charged for new water meters. (Gary Aff., Ex. 3 at 716.)

### D. Services for Other Communities

#### 1. Pine Forest

Pine Forest is a predominately white subdivision that was annexed by Port Wentworth in 1989 along with the

Berrien, Saussy, and Montieth Roads.[11]  Pine Forest was built prior to 1989 and had its own private water and sewer system.  By the time of the City's water and sewer extension to North Port Wentworth, the Pine Forest system was failing and residents were experiencing sewage backups. (Claxton Dep. at 78-79; Hinely Dep. at 52-56.)  The City acquired the Pine Forest system in 2001 and spent between $200,000 and $1 million on upgrades.  (Claxton Dep. at 80.) The City sought a 20-foot permanent easement and a 20-foot temporary construction easement from several residents in order to make the connection from the City mains to the Pine Forest system.  (Gary Aff., Ex. 4 at 275, 993.)  This upgrade occurred around the same time the City made the offer of water and sewer to residents on Berrien and Saussy Roads.  (See Gary Aff., Ex. 3 at 716.)

### 2. Pleasant Drive

Plaintiffs claim that the City provided water to several residents on Pleasant Drive, a predominately white street, at the City's expense and without requiring a 60-foot right-of-way.  About four "residents," a small number of the total on Pleasant Drive, were allowed to tap into

---

[11] Defendants emphasize that there are some African-Americans who now live in Pine Forest.  It is undisputed, however, that Pine Forest has always been either an all-white neighborhood or a predominately-white neighborhood. (See Young Dep. at 72-73.)

the Highway 21 line. The City's former Director of Public Works, Tommy Thomas, testified that because these residents were close to the Highway 21 transmission line, the City was able to run a 2-inch line to those households for less than $1,000. (Thomas Dep. at 32-33.)

### 3. Rice Hope

Rice Hope is a large, new residential and commercial development, currently under construction across Highway 21 from Berrien and Saussy Roads. Rice Hope, which is being developed in phases by private entities, follows the zoning scheme set forth in the Master Plan. (Grabowski Dep. at 80.) It includes single-family houses, condominiums, a commercial center, and other features such as a lake.

The City signed a wastewater and development agreement with the master developer of Rice Hope on April 22, 2004. (Holbrook Dep., Ex. 58.) Under this agreement, the City agreed to expand its capacity in order to provide sufficient water and sewer services to Rice Hope.

One of the City's main lines for Rice Hope runs "right in between Berrien and Saussy Road, and then connects to the main transmission line." (Claxton Dep. at 99.) The

private developer was responsible for running the water and sewer lines within the Rice Hope property.[12]

### E. Drainage

#### 1. Ditch Cleaning

Plaintiffs allege that they have received inferior ditch service. Plaintiff Steele testified that the ditches along Berrien and Saussy Roads are not regularly serviced, but that the ditches in the core City are well-landscaped and serviced. (Steele Dep. at 125-126.)

In their response to the City's Motion for Summary Judgment, Plaintiffs present photographs that they contend show inferior ditch service. The subject-matter of these photographs is not clearly identified.[13] Photograph P63 shows a ditch along a street, presumably Berrien or Saussy Road, that has some debris and standing water. (Gary Aff., Ex. 1 at P63.) There are also photographs showing well-landscaped ditches along other streets, presumably in white

---

[12] The development agreement between the City and the private developer states that the private developer "shall construct and install sewer lines and lift stations within the Rice Hope property. . .at [its] sole expense" and "will also install at its expense all water lines located within the Rice Hope property." (Holbrook Dep., Ex. 58 ¶¶ 2(c) & 3(b).)

[13] The City objects to the use of the photographs because they have neither been authenticated nor clearly identified. However, the Court has considered the photographs for the evidentiary value they provide.

neighborhoods. (Gary Aff., Ex. 1 at P67-69.) All of the other photographs show "canals" and not "ditches."[14]

For the City, Tommy Thomas and Jimmy Ford, from the Public Works Department, testified that the ditches are cleaned once per year in both African-American and white communities and that the level of service is "the same." (Thomas Dep. at 78-79, 113; Ford Dep. at 74-76.) Thomas testified that around 2002 or 2003, the City began a system where they clean all of the ditches in the City starting from the south and ending in the north. Prior to that time, the ditch cleaning was performed un-systematically, primarily by responding to resident complaints. (Thomas Dep. at 72-73.)

Plaintiffs agree that the City has been doing a better job of cleaning the ditches since the original lawsuit was filed in 2003. (Benton Dep. at 91; Steele Dep. at 135-137.) Plaintiff Steele testified that they come out "periodically" to service the ditches, but that they do not remove all of the debris from the culverts when they come. (Steele Dep. at 135.)

---

[14] The parties' use of the terms "canal" and "ditch" may not be consistent with engineering terminology. But for purposes of this case, a "ditch" runs alongside a road, and a "canal" is larger than a roadside "ditch."

## 2. The Saussy Canal

Plaintiffs also allege that the City has failed to maintain the Saussy Canal, which runs behind Plaintiff Benton's property and later passes under Saussy Road. The City admits that it has not maintained the canal since annexation in 1989. (Ford Dep. at 30, 97.) Prior to annexation, the County maintained the canal using manual prison labor. For canals in the core City, the City either maintains the canals or contracts with the County for canal cleaning.

Plaintiff Benton testified that the canals in the core City are clean, with neatly cut banks, no overgrowth, and clear culverts. She states that even after a heavy rain, the canals do not flood in the core city and the water flows out through the canals. In contrast, she states that the Saussy canal is full of debris, trees, and standing water. She states that the water backs up at the culvert. (Benton Dep. at 92-93.) She also testified that after one heavy rainfall, the water came up to the steps of the concrete on her back patio. (Benton Dep. at 98.)

The City offers several reasons why it does not clean the Saussy canal. First, the City contends that portions of the canal are located on private property. (Jeffers Dep. at 50; Ford Dep. at 97.) Second, the City's experts

25

testified that the canal is located in a wetland, such that any maintenance or dredging would require a permit from the Corps of Engineers. (DeMell Dep. at 108-110, 114, Ex. 6 D00185; Nicholson Dep. at 89.) Third, the City's experts testified that because the land around the canal is undeveloped, any improvements to the canal would require that an access road be built along the canal to provide ingress for mechanized equipment. This would require an easement from private landowners. (Nicholson Dep. at 90, 105-106.) Fourth, the City's experts testified that maintenance to that portion of the canal would only provide a "minor improvement" to the drainage, partly because of the flat grade, and partly because during a heavy rainfall, any water backup is exacerbated by pressure downstream where the canal flows into Black Creek. (Nicholson Dep. at 82, 110-114.)

### F. Jeffers/Colbrook Road

Plaintiffs contend that a private property owner, Mr. Lynn Jeffers, has unilaterally closed Jeffers/Colbrook Road and is denying access to African-American residents. Plaintiffs have produced at Department of Transportation map that they contend lists Jeffers Road as a county road. (Jeffers Dep., Ex. 83.) Mr. Jeffers stated that he put a gate up on the road in 1990. (Jeffers Dep. at 115.)

Plaintiff Steele testified that Mr. Jeffers's son placed dirt mounds, no trespassing signs, and nails on the part of the road she used to access her property. Plaintiffs also contend that they have been threatened by Jeffers's son.

## G.   Procedural Posture

Plaintiff originally filed suit against the City on October 22, 2003, alleging discrimination on the basis of race for failing to provide equal water, sewer, and drainage services and for allowing the private closure of Jeffers/Colbrook Road.   That case was dismissed without prejudice, pursuant to a stipulation of dismissal, on February 4, 2005.   Steele v. City of Port Wentworth, CV403-211 (S.D. Ga.)

Plaintiffs re-filed the instant action on August 3, 2005.   The Complaint sets forth five claims for relief, alleging discrimination on the basis of race in violation of (1) the Fair Housing Act ("FHA"), 42 USC § 3604(b); (2) the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983; (3) the Thirteenth Amendment and 42 U.S.C. § 1982; (4) the Georgia Fair Housing Act, O.C.G.A. § 8-3-200 et seq.; and (5) the Equal Protection Clause of the Georgia Constitution, Article I, § I, Paragraph II.

In its Motion for Summary Judgment, the City has challenged Plaintiffs' claims on both procedural grounds

and the merits.  After setting forth the summary judgment standard, the Court will first consider whether Plaintiffs have stated a claim under the Fair Housing Act.  Then the Court will address the merits of Plaintiffs' constitutional claims and whether they have shown sufficient evidence of a continuing violation.[15]

## II.  **SUMMARY JUDGMENT STANDARD**

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citing Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

[15] As a result of the Court's holdings in this Order, it is not necessary for the Court to consider whether the NPWCC has standing in this case.  Accordingly, the Court makes no ruling on the issue of NPWCC's standing.

party will bear the burden of proof at trial." Celotex
Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552,
91 L. Ed. 2d 265 (1986). The substantive law governing the
action determines whether an element is essential. DeLong
Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505
(11th Cir. 1989).

"[A] party seeking summary judgment always bears the
initial responsibility of informing the district court of
the basis for its motion, and identifying those portions of
the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,
which it believes demonstrate the absence of a genuine
issue of material fact." Celotex, 477 U.S. at 323. The
burden then shifts to the nonmovant to establish, by going
beyond the pleadings, that there is a genuine issue as to
facts material to the nonmovant's case. Clark v. Coats &
Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court
must review the evidence and all reasonable factual
inferences arising from it in the light most favorable to
the nonmovant. Matsushita, 475 U.S. at 587-588. However,
the nonmoving party "must do more than simply show that
there is some metaphysical doubt as to the material facts."
Id. at 586. A mere "scintilla" of evidence, or simply
conclusory allegations, will not suffice. See, e.g.,

*Tidwell v. Carter Prods.*, 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989).

## III. PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE FAIR HOUSING ACT

In Count One, Plaintiffs contend that the City violated the Fair Housing Act, 42 U.S.C. § 3604(b), by "engaging in a pattern of discrimination against class members on the basis of race in the provision of services or facilities in connection with their ownership, use and enjoyment of residential property . . . ." (Compl. ¶ 61). Defendants argue that this claim should be dismissed because the Fair Housing Act only applies to discrimination related to the acquisition, sale, or rental of housing and does not apply to post-acquisition discrimination in the provision of municipal services.

Section § 3604(b) provides: "It shall be unlawful. . .[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in

connection therewith, because of race, color, religion, sex, familial status, or national origin."

There is a split in authority about whether this statute applies to a discriminatory refusal to provide municipal services. The "crux" of this split is the interpretation of the meaning of "therewith" in the phrase "in connection therewith." <u>Lopez v. City of Dallas</u>, No. 3:03-CV-2223, 2004 WL 2026804, at *7 (N.D. Tex. September 09, 2004). "To determine whether the scope of § 3604(b) extends beyond the sale or rental of housing, it is necessary to decide whether the language 'in connection with' refers to the 'sale or rental of a dwelling' or merely the 'dwelling' in general." <u>Cox v. City of Dallas</u>, No. 3:98-CV-1763, 2004 WL 370242, at *7 (N.D. Tex. Feb. 24, 2004).

Both the Fourth and Seventh Circuits have commented, in dicta, that § 3604(b) could be applied to a discriminatory refusal to provide municipal services such as garbage collection or police and fire protection. <u>Jersey Heights Neighborhood Ass'n v. Glendening</u>, 174 F.3d 180, 193 (4th Cir. 1999)(holding that government's decision regarding location of highway bypass was not actionable under § 3604); <u>Southend Neighborhood Improvement Ass'n v. St. Clair County</u>, 743 F.2d 1207, 1210 (7th Cir.

1984)(holding that county's refusal to manage neighboring properties was not actionable).

The Fifth Circuit and the D.C. Circuit, however, have limited the scope of § 3604(b) to services provided in connection with the sale or rental of housing. See Cox v. City of Dallas, 430 F.3d 734, 746 (5th Cir. 2005)("[T]he 'services' subject to the alleged discrimination must be 'in connection' with the 'sale or rental of a dwelling.'"); Clifton Terrace Assoc., Ltd. v. United Tech. Corp., 929 F.2d 714, 719 (D.C. Cir. 1991)(holding that the FHA only applies to discrimination that adversely affects the "availability" of housing, and not to discrimination affecting "habitability").

This appears to be the majority position among district courts that have considered the issue. See King v. Metcalf 56 Homes Ass'n, No. 04-2192, 2004 WL 2538379, at *2 (D. Kan. Nov. 08, 2004)("The plain language of the statute . . . limits the scope of § 3604(b) to discrimination in connection with the sale or rental of housing, [and] district courts have widely held that § 3604(b) extends only to discrimination that impacts the accessibility and availability of housing, not to claims of discriminatory conduct relating to the use and enjoyment of previously acquired housing.")(internal citations omitted);

Lawrence v. Courtyards at Deerwood Ass'n, Inc., 318 F. Supp. 2d 1133, 1141-43 (S.D. Fla. 2004)(stating that § 3604(b) is limited to conduct that relates to the acquisition or sale and rental of housing); Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc., 276 F. Supp. 2d 1222, 1233 (M.D. Fla. 2003)("The context of the use of the phrase 'in connection therewith' clearly limits claims for discriminatory provision of services to the provision of those services in connection with a sale, because the preceding sentence mentions only the sale or rental of a dwelling.")(decision vacated after parties reached settlement).

This Court agrees that a limited interpretation is more consistent with the plain language of the statute, which refers to services in connection with a sale or rental. In the instant case, the alleged discrimination in the provision of services is wholly unrelated to the sale or rental of the subject properties, which many Plaintiffs have owned since before the City annexed the area. The alleged deprivation of water, sewer, and drainage also does not affect the availability of housing in this case; the housing has remained available to Plaintiffs because they have access to water and sanitation through wells and

septic systems.[16]  For these reasons, the Court holds that Plaintiffs' discrimination claims are more properly pursued under §§ 1982 and 1983.  See Clifton Terrace, 929 F.2d at 720 ("Of course, if a municipal government withholds or extends essential city services in a racially discriminatory manner, it violates the equal protection clause of the Fourteenth Amendment.").

Accordingly, the claim brought pursuant to § 3604(b) of the Fair Housing Act is **DISMISSED.**  And because the language of the Georgia Fair Housing Act, O.C.G.A. § 8-3-202(2), is identical to § 3604(b), the claim under the Georgia Fair Housing Act is also **DISMISSED.**

## IV.  CLAIMS FOR DISCRIMINATION IN THE PROVISION OF MUNICIPAL SERVICES

### A.  Disparate Impact

Plaintiffs seek to pursue their claims for denial of water, sewer, and drainage under theories of both disparate treatment and disparate impact.  But "official action will not be held unconstitutional solely because it results in a racially disproportionate impact."  Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)(citing Washington v.

---

[16] As explained in Part VI.A, infra, the Court holds that Plaintiffs' claims regarding the blocking of Jeffers/Colbrook Road are time barred.

_Davis_, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597
(1976)). Instead, "[p]roof of racially discriminatory
intent or purpose is required to show a violation of the
Equal Protection Clause." _Id._ at 265. Intentional
discrimination is also required for claims brought pursuant
to § 1982. _Jackson v. Okaloosa County_, 21 F.3d 1531,
1543 (11th Cir. 1994). Accordingly, Plaintiffs may not
pursue these claims on a theory of disparate impact.[17]

### B. Disparate Treatment

The Complaint alleges that the City has provided
African-American residents with inferior municipal
services on the basis of race. It is well-established that
these allegations state a claim under the Equal Protection
Clause of the Fourteenth Amendment. _Hawkins v. Town of
Shaw_, 437 F.2d 1286 (5th Cir. 1971), _aff'd on rehearing en
banc_, 461 F.2d 1171, 1173 (5th Cir. 1972)(seminal case
regarding street paving, lighting, and sewer); _see also
Ammons v. Dade City_, 783 F.2d 982 (11th Cir. 1986)(street
paving, maintenance, and drainage); _Dowdell v. City of
Apopka_, 698 F.2d 1181 (11th Cir. 1983)(street paving,
water, and drainage). And because there is no substantial

---

[17] A claim for disparate impact would be cognizable under
the Fair Housing Act. _See Hallmark Dev., Inc. v. Fulton
County_, 466 F.3d 1276, 1286 (11th Cir. 2006). But the
Court has already dismissed the FHA claim on other grounds.
_See supra_ Part III.

difference between Plaintiffs' claims under § 1982 and § 1983, the Court will consider these claims together. See Jackson, 21 F.3d at 1543.[18]

### 1. Discriminatory Intent

To prevail on these claims, Plaintiffs must show that the disparity in services is caused by "discriminatory intent." Significantly, this does not require a plaintiff to prove that the challenged action or inaction rested "solely" on racially discriminatory purposes, or even that this was the "dominant" or "primary" purpose. Arlington Heights, 429 U.S. at 265. "Discriminatory intent is not synonymous with a racially discriminatory motive." Dowdell, 698 F.2d at 1185. Rather, a plaintiff must show that an unconstitutional discriminatory purpose was a "motivating factor in the decision." Arlington Heights, 429 U.S. at 266. A court should consider whether the cumulative evidence of action and inaction objectively manifests discriminatory intent and whether the correlation

---

[18] Plaintiffs' claims based specifically on the Thirteenth Amendment are dismissed. The Thirteenth Amendment provides, in relevant part: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." The Court holds that the City's failure to provide water, sewer, and drainage cannot be fairly characterized as a badge or incident of slavery. See City of Memphis v. Greene, 451 U.S. 100, 126, 101 S. Ct. 1584, 67 L. Ed. 2d 769 (1981).

between municipal service disparities and racially tainted purposiveness is sufficient to show that race played a role in the decisions. Dowdell, 698 F.2d at 1185-86; Hallmark Developers, Inc. v. Fulton County, 466 F.3d 1276, 1285 (11th Cir. 2006). Not every disparity between services provided to citizens of a town or city rises to the level of a constitutional violation. Hawkins, 461 F.2d at 1173.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266. The Eleventh Circuit has identified a non-exhaustive list of circumstantial factors that may be probative of discriminatory intent, including (1) "the magnitude of the disparity;" (2) "the legislative and administrative pattern of decision-making;" and (3) that a "continued and systematic relative deprivation of the black community was the obviously foreseeable outcome" of the policies or decisions. Dowdell, 698 F.2d at 1186.[19] In addition, "[w]hile voluntary acts and awareness of consequences alone do not necessitate a finding of discriminatory intent, actions having foreseeable and anticipated disparate impact

---

[19] The Supreme Court provided a similar list of factors in Arlington Heights. 429 U.S. at 266.

are relevant evidence to prove the ultimate fact, forbidden purpose." Id. (internal citations and quotations omitted). No single factor will necessarily be conclusive, and the court should consider the totality of the relevant circumstances. Id.

### 2. Burden-Shifting Framework

The burden-shifting approach set forth in McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) applies in this case. This analytical structure was developed in the context of Title VII employment claims, but it is also applicable to claims of racial discrimination brought under § 1983. Koch v. Rugg, 221 F.3d 1283, 1298 n.31 (11th Cir. 2000); Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1082-83 (11th Cir. 1996). Courts have adapted this framework for use in municipal services equalization cases. Kennedy v. City of Zanesville, 505 F. Supp. 2d 456, 495 (S.D. Ohio 2007); Middlebrook v. City of Bartlett, 341 F. Supp. 2d 950, 959 (W.D. Tenn. 2003).

First, under the McDonnell Douglas framework, the plaintiffs have the burden of establishing a prima facie case of discrimination. Harris, 99 F.3d at 1083. The proof required to establish a prima facie case will vary depending on the circumstances. Richardson v. Leeds Police

Dept., 71 F.3d 801, 805 n.5 (11th Cir. 1995). To establish a prima facie case in most municipal services actions, the plaintiffs must show that (1) they were members of a protected class or residents of a protected-class neighborhood; (2) they submitted a request for municipal services; (3) such requests were rejected; and (4) the defendant provided the municipal service to similarly situated individuals outside the protected class or protected-class neighborhood. City of Zanesville, 505 F. Supp. 2d at 495; Middlebrook, 341 F. Supp. 2d at 959.

Second, if the plaintiffs meet this initial burden, "the defendant has the burden to produce a 'legitimate, nondiscriminatory reason' for the allegedly discriminatory action." Harris, 99 F.3d at 1083. "Third, if the defendant satisfies this burden of production, the plaintiff[s have] an opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the fact-finder that the defendant intentionally discriminated against the plaintiff[s]. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff[s] remains at all times with the plaintiff[s]." Texas Dept.

of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct.
1089, 67 L. Ed. 2d 207 (1981).

## V.   THE STATUTE OF LIMITATIONS AND THE CONTINUING VIOLATION DOCTRINE

### A.   The Statute of Limitations

In its Motion for Summary Judgment, the City contends
that Plaintiffs' claims are time-barred. Plaintiffs
originally filed suit on October 22, 2003. See Steele v.
City of Port Wentworth, CV403-211 (S.D. Ga. filed Oct. 22,
2003). On January 11, 2005, this first suit was dismissed
without prejudice pursuant to a stipulation of dismissal
filed by all parties. (Doc. 42, Ex. P.) The stipulation
stated: "The condition of this stipulation is that, to the
extent any of the claims raised by plaintiffs are not
subject to the Georgia renewal statute, O.C.G.A.
§ 9-2-61(a), the statute of limitations as to such claims
is tolled for a period of six months from the date this
stipulation is filed." (Id.) By the plain language of the
stipulation, the statute of limitations on all claims in
the original suit was tolled until July 11, 2005. However,
Plaintiffs did not re-file within the six-month window, and
instead re-filed on August 3, 2005. Therefore, the
stipulation does not apply. To be timely, Plaintiffs'
claims must have been filed within the applicable statute

of limitations independent of the agreed upon tolling period.

The statute of limitations on Plaintiffs' claims is two years. See Porter v. Ray, 461 F.3d 1315, 1323 (11th Cir. 2006)(stating that Georgia's two-year statute of limitations for personal injury governs claims pursuant to § 1983). The City contends that the claims are time-barred because all of the alleged discriminatory acts occurred outside of the limitations period – that is, before August 3, 2003. Plaintiffs argue that the claims are not time-barred because the City's actions constitute a continuing violation.

## B.    The Continuing Violation Doctrine

Under the continuing violation doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred "where the violation giving rise to the claim continues to occur within the limitations period." Nat. Parks and Conservation Ass'n, Inc. v. Tenn. Valley Auth., 502 F.3d 1316, 1322 (11th Cir. 2007)(citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)). The continuing violation doctrine is a narrowly limited exception to the usual rule

that statutes of limitations are triggered at the time the alleged discriminatory act occurred.[20]

To come within the continuing violation doctrine, a plaintiff must show a "systemic violation," that is, "a longstanding and demonstrable policy of discrimination." LRL Prop. v. Portage Metro Hous. Auth., 55 F.3d 1097, 1106 (6th Cir. 1995).[21] "A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint." Provencher, 145 F.3d at 14 (systemic violation requires no identifiable act of discrimination within the

---

[20] Although the continuing violation doctrine has been most frequently applied to employment discrimination claims, it is also applicable in other contexts. See e.g., Havens, 455 U.S. at 380-81 (Fair Housing Act); Heard v. Sheahan, 253 F.3d 316 (7th Cir. 2001)(prison inmate's § 1983 claim for denial of medical care); Kuhnle Bros., Inc. v. County of Geauga, 103 F.3d 516 (6th Cir. 1997)(constitutional challenge to trucking ordinance).

[21] Courts historically recognized two categories of continuing violations: "serial" and "systemic." Sharpe v. Cureton, 319 F.3d 259, 266 (6th Cir. 2003); Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990). A "serial" violation was shown by "a chain of similar discriminatory acts." Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998). However, in National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the Supreme Court held that serial acts do not constitute a continuing violation. See O'Connor v. City of Newark, 440 F.3d 125, 127 (3rd Cir. 2006)(holding that after Morgan "discrete acts . . . cannot be aggregated under a continuing violations theory.")

limitations period). "Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing 'over-arching policy of discrimination.'" LRL Prop., 55 F.3d at 1106 (quoting Janikowski v. Bendix Corp., 823 F.2d 945, 948 (6th Cir. 1987)). To establish a systemic violation in an employment case, for example, a plaintiff "must demonstrate something more than the existence of discriminatory treatment;" instead, a plaintiff "must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure." Sharpe, 319 F.3d at 268-269 (internal citations and quotations omitted).

The Eleventh Circuit has focused on two aspects of an alleged continuing violation.[22] First, the Eleventh Circuit has held that "the critical distinction in the continuing

---

[22] The Third and Fifth Circuits, among others, have identified three factors that should be considered in determining whether a continuing violation exists: (1) subject matter – whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency – whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence – whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert [his or her] rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. Cowell v. Palmer Tp., 263 F.3d 286, 292 (3rd Cir. 2001); Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 352 (5th Cir. 2001).

violation analysis is whether the plaintiff complains of the present consequence of a one time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." E.g., Porter, 461 F.3d at 1323; Lovett v. Ray, 327 F.3d 1181, 1183 (11th Cir. 2003). "Non-action" should typically not be construed as a continuing violation. Ctr. For Biological Diversity v. Hamilton, 453 F.3d 1331, 1336 (11th Cir. 2006).

Second, the Eleventh Circuit has given considerable weight to a plaintiff's awareness of his or her rights and the duty to bring a timely claim. "The continuing violation doctrine is premised on 'the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'" Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1222 (11th Cir. 2001)(quoting Alldread v. City of Grenada, 988 F.2d 1425, 1432 (5th Cir. 1993)). For this reason, courts have "limited the application of the continuing violation doctrine to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred." Ctr. For Biological Diversity, 453 F.3d at 1335. "[I]f an event or

series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine . . . ." Hipp, 252 F.3d at 1222 (quoting Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1415 n.6 (10th Cir. 1993).

## VI.  ANALYSIS OF PLAINTIFFS' CLAIMS

The City argues both that Plaintiffs' claims are time-barred and that they fail on the merits. For the claims to be timely, Plaintiffs must show either discrete claims within the limitations period or a systemic continuing violation. Plaintiffs can survive summary judgment by creating a genuine issue of material fact with respect to the alleged systemic continuing violation. Rural Water Sys. No. 1 v. City of Sioux Ctr., 967 F. Supp. 1483, 1508 (N.D. Iowa 1997). As explained below, the Court holds that Plaintiffs have not carried this burden.

### A.  The Claim Regarding Jeffers/Colbrook Road Does Not Constitute a Continuing Violation

Plaintiffs claim that the City has discriminated against them by failing to reopen a road that has been blocked by a private citizen. Because Mr. Jeffers put a gate across the road in 1990, approximately 18 years ago,

this claim accrued many years outside of the two-year limitations period.

The Court holds that the closure of the road and the City's failure to reopen it constitute discrete acts that should have triggered Plaintiffs' awareness of their rights when the road was first blocked. Furthermore, because a single event – the erection of the gate and closing of the road – has given rise to continuing injuries, the continuing violation doctrine does not apply. See Clark v. City of Braidwood, 318 F.3d 764, 767 (7th Cir. 2003)(holding that installation of city pipes on plaintiff's land was a discrete event, even though existence of pipes was "permanent"). Even if Plaintiffs were to prove discriminatory conduct on the part of the City in failing to reopen the road, the continuing road closure would represent merely the subsequent effects of an earlier discriminatory action. See Ctr. For Biological Diversity, 453 F.3d at 1336 (holding that claim against Secretary of Department of Interior for failure to designate critical habitat for two endangered species accrued on date of initial decision, and ongoing failure to designate habitat was not continuing violation); Cowell v. Palmer Tp., 263 F.3d 286, 293 (holding that placement of municipal liens on plaintiffs' property was the relevant

act; neither continuing existence of the liens nor city's refusal to remove them was a continuing violation).

Therefore, the City's ongoing inaction with respect to Jeffers/Colbrook Road is not a continuing violation that tolls the limitations period.[23] And this claim cannot be tied together with Plaintiff's other claims, because it is unrelated in time and subject matter. The other claims involve the denial of municipal services, allegedly on the basis of race. The road claim more closely resembles a property dispute between adjoining landowners. Accordingly, the Court holds that all claims regarding Jeffers/Colbrook Road are time barred and are therefore **DISMISSED.**[24]

### B. **Plaintiffs' Claim Regarding the Saussy Canal Fails on the Merits**

The Court finds that Plaintiffs have failed to establish a prima facie case on their claim that the City has discriminated by not maintaining the Saussy canal.

---

[23] The City has moved to strike several affidavits offered by the Plaintiffs in support of the road claim. Because the road claim is time-barred, the Motion to Strike these affidavits is **DENIED AS MOOT.**

[24] If Plaintiffs are being denied access to their property because of a dispute over the access road (or if a private landowner is setting traps and/or making threats), there may be other legal remedies available to them. The Court's dismissal of the road claim in this case applies only to claims against the City for discrimination on the basis of race.

Although they have shown the first three elements of a prima facie case – that the canal is located in an African-American neighborhood; that they requested that the canal be cleaned; and that the City refused to clean the canal – they have not produced evidence that the City cleaned similar canals outside of the protected-class neighborhood. They produced evidence that the City cleans other canals within the City limits, but there was no evidence that those canals were similar to the Saussy canal. To the contrary, the City offered evidence of many significant differences between the Saussy canal and other canals: (1) the Saussy canal is on private property; (2) the Saussy canal is in a wetland; and (3) there is no access for mechanized equipment along the canal.

These differences also represent legitimate nondiscriminatory reasons why the City has not maintained the Saussy canal. Plaintiffs have not produced any evidence that the City's reasons are inaccurate or pretextual. There is no evidence that the Saussy canal is not on private property, no evidence that the City cleans other canals on private property, and no evidence that the City cleans, or has sought permits to clean, other canals in a wetland. Accordingly, Plaintiffs' claims regarding the Saussy canal are **DISMISSED.**

## C. Plaintiffs Have Not Shown Any Discrete Violations Within the Limitations Period

The Court also holds that Plaintiffs have not shown any discrete violations within the limitations period. Plaintiffs do not specifically argue that there are discrete violations within the limitations period, and instead rely on the continuing violation theory. (See Plfs.' Br., Doc. 62 at 12.) But the Court will briefly consider Plaintiffs' factual allegations with respect to acts occurring within the limitations period – that is, after August 3, 2003.

### 1. Ditch Cleaning

The Court holds that Plaintiffs have not established an actionable claim for inferior roadside ditch cleaning within the limitations period. Plaintiffs admit that the City has been doing a better job of cleaning the ditches since the original lawsuit was filed in 2003. Defendants presented evidence that it was around this time that the City created an organized plan for regularly cleaning all of the ditches in the City. Even taken in the light most favorable to Plaintiffs, they have not shown a level of disparity in services since 2003 sufficient to create a genuine issue of material fact with respect to disparate treatment.

### 2. Water and Sewer

The City argues that there are no discrete acts regarding water and sewer that occurred after August 3, 2003. The allegedly discriminatory offer of water and sewer to residents of Berrien and Saussy Roads occurred in 2001. The allegedly discriminatory offer of water to residents of Montieth Road occurred in March 2003.

Plaintiffs have shown that in 2004, within the limitations period, the City signed a development contract with the Rice Hope development and extended the water and sewer mains to Rice Hope. One of the main lines to Rice Hope runs between Berrien and Saussy Roads. Plaintiffs contend that the City should have provided water and sewer to Berrien and Saussy Roads either before or in connection with the services performed for Rice Hope.

The Court holds that the City's actions with respect to Rice Hope are not independently actionable, because the situation with Rice Hope is too dissimilar to Berrien and Saussy Roads. To accommodate Rice Hope, the City agreed to extend the mains and provide capacity. With Berrien and Saussy Roads, the extension of the mains was never an issue: the mains that would have been used to connect Berrien and Saussy were constructed in 2000. The mains constructed in 2004 to service Rice Hope are unrelated.

And Plaintiffs have presented no evidence that lack of capacity was ever a justification used by the City to deny water and sewer to Berrien and Saussy Roads.

Instead, the issue on Berrien and Saussy Roads was how to run the lines down the streets to service the houses. Within Rice Hope, the City was not involved in running lines to individual streets or houses. Therefore, the only services that Plaintiffs claim were done for Rice Hope – extending the mains and offering capacity – are things that the City had already done for Berrien and Saussy Roads. For this reason, Rice Hope cannot provide a basis for Plaintiffs' claims.

### D. **Plaintiffs Have Not Shown A Systemic Continuing Violation**

Finally, the Court holds that Plaintiffs have not created a genuine issue of material fact or a jury question with respect to the alleged systemic continuing violation. Although the circumstances surrounding the Master Plan and the offer of water and sewer in 2001 may raise an inference of discriminatory intent, there is not sufficient evidence of an over-arching policy or practice of discrimination.

Taking the evidence in the light most favorable to Plaintiffs, the circumstances surrounding the Master Plan show that Plaintiffs' existing neighborhoods were not

considered in the initial planning process. The facts show that the planners envisioned that the neighborhoods would be eliminated to make way for future commercial development. This arguably raises an inference of discrimination, because Plaintiffs contend that a similarly situated white neighborhood, Pine Forest, was not disregarded in the planning process.[25]

But it is also undisputed that the Master Plan was revised so that Berrien and Saussy Roads would remain zoned as single-family residential. Although Plaintiffs claim that their neighborhoods were not included in water and sewer planning, engineers hired by the City drew plans to extend water and sewer to Berrien and Saussy Roads, and the contractor built the main transmission lines that extended to a hook-up point for Berrien and Saussy.[26] These actions

---

[25] Plaintiffs allegations imply that Pine Forest was not disregarded in the planning process, but Plaintiffs have pointed to no evidence about Pine Forests' treatment during the development of the Master Plan.

[26] Plaintiffs contend that in the late 1990s the City failed to include their neighborhoods in the initial stages of water and sewer planning, which was targeted at areas where new development was envisioned. (See Plfs.' St. Mt. Facts ¶ 7; Gary Aff., Ex. 4 at 20-32 (March 1998 report on planned extensions) and at 33-43 (November 1997 report on planned extensions)). But Plaintiffs acknowledge that construction of the water and sewer mains to the area did not occur until 2000. (Plfs.' St. Mt. Facts ¶ 2.) The City's engineering firm was in the process of drafting plans for water and sewer on Berrien and Saussy Roads during this same time period – the latter part of 2000 and

are inconsistent with an over-arching and ongoing policy of discrimination in the development of the Master Plan.[27] Even if there was discriminatory intent with respect to the creation of the initial Master Plan, Plaintiffs have not shown that the discriminatory intent was carried forward in a systemic way.

Plaintiffs also argue that the City made a discriminatory offer of water and sewer to Berrien and Saussy Roads in 2001. They contend that the offer was illusory, because the 60-foot right-of-way condition was unreasonable. They present evidence that a 60-foot right-of-way would overlap structures on residents' property and that such a right-of-way would dramatically change the character of the neighborhood. The City has proffered a legitimate nondiscriminatory reason by showing that a 60-foot right-of-way is a common practice in this area. But Plaintiffs have presented evidence that this reason may have been a pretext for discrimination, for several

_____

early 2001. (Askeland Dep., Ex. 50-53 (plans dated May 11, 2000, November 15, 2000, and January 5, 2001.) The City's offer of services to the residents occurred in May 2001. The Court finds no evidence of discriminatory intent in this linear sequence of planning and construction.

[27] Despite Plaintiffs' fears, and even though the initial Master Plan contemplated the replacement of their neighborhoods, there is no evidence suggesting that the City had any plan to condemn their property or force them to sell.

reasons. The original engineering plans called for a much smaller right-of-way than the City required. And the experts agreed that it was feasible, even if not preferable, to extend the lines down the streets with less than a 60-foot right-of-way.

But even assuming that this is evidence of discrimination occurring in 2001, Plaintiffs have not presented evidence of a systemic continuing violation continuing into the present. First, even if the offer of water and sewer was discriminatory, the present consequences of that violation do not extend the limitations period. Second, the event should have alerted Plaintiffs of a possible violation of their rights and their duty to file a timely claim. Here, Plaintiffs did originally file a timely claim, but that suit was voluntarily dismissed. Because the application of the continuing violation doctrine is usually limited to "situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred," Plaintiffs cannot demonstrate a continuing violation in this case. See Ctr. For Biological Diversity, 453 F.3d at 1335. And for the reasons explained above, the City's agreement with Rice Hope does not

establish that the City was pursuing an over-arching policy or practice of discrimination.

The other neighborhoods discussed by Plaintiffs, Pine Forest and Pleasant Drive, also do not provide comparisons that are probative of an over-arching policy or practice of discrimination. Indeed, Plaintiffs have shown no evidence that City ever installed water and sewer in a predominantly white neighborhood without having a 60-ft right of way. The Pine Forest situation is distinguishable. While it is true that the City requested a smaller easement from only a few of the Pine Forest residents, this was not for the purpose of running lines down the streets. Instead, it was to make the connection from the City mains to Pine Forest's private system. Therefore, the differing right-of-way requests cannot be compared.

The provision of water and sewer to four residents on Pleasant Drive is also not comparable to the issues on Berrien and Saussy Roads. On Pleasant Drive, the City was able to run a 2-inch line to four residents at a minimal cost – less than $1,000. Because the scale of this project is much smaller than an installation on Berrien and Saussy Roads, the City's provision of services to the Pleasant Drive residents is not probative of discriminatory intent.

Instead, the situation with Berrien and Saussy Roads appears to be unique in Port Wentworth.

Plaintiffs have presented evidence that, in March 2003, residents of Montieth Road were offered city water, but that they were asked to pay more in connection charges than residents of Pine Forest. Assuming that this is evidence of discrimination, it was a discrete event that occurred outside of the limitations period and should have alerted Plaintiffs to the violation of their rights.

Finally, the magnitude of the continuing disparity in services is not sufficient to show that the City's inaction constitutes a systemic policy of discrimination. Plaintiffs have presented evidence that the predominately-African-American neighborhoods do not have city sewer and/or water. But although Plaintiffs lack access to city water and sewer, they continue to have access to water and sanitation through their deep wells and septic systems. Plaintiffs have pointed to no evidence to show that their wells and septic systems are measurably inferior to city water and sewer. For example, an Ohio district court found a continuing violation in a similar case where the ground water was contaminated by mining and where Plaintiffs hauled water, had water delivered, and even collected rain water and melted snow in order to have safe, usable water

for drinking, cooking, and bathing. Kennedy v. City of Zanesville, 505 F. Supp. 2d 456, 463 (S.D. Ohio 2007). Plaintiffs seek to rely on City of Zanesville, but the evidence of disparity shown here does not approach the level of disparity shown in that case.

Similarly, although Plaintiffs have presented some evidence of inferior drainage service, there is no allegation that this has caused any significant flooding or other damage to their properties.[28] Therefore, even though Plaintiffs have presented some evidence that the municipal services are not equal, they have not shown evidence that a "continued and systematic relative deprivation of the black community was the obviously foreseeable outcome" of the City's policies or decisions, as they would need to show to establish a continuing violation. Dowdell, 698 F.2d at 1186.

This is not to say that an ongoing deprivation of these communities could never become actionable, particularly if the area around their neighborhoods continues to develop. But the Court holds that, based on the facts presented at this time, Plaintiffs have not shown

---

[28] The only evidence of possible flooding or damage is Plaintiff Benton's testimony that the water came up to the steps of the concrete on her back patio after a heavy rain on one occasion. (Benton Dep. at 98.)

a systemic continuing violation. Plaintiffs' equal protection claims under both the Fourteenth Amendment and the Georgia Constitution are therefore **DISMISSED** as untimely. Plaintiffs' § 1982 claim is **DISMISSED** for the same reasons.

## VII. CONCLUSION

Accordingly, the City's Motion for Summary Judgment is **GRANTED.** The Clerk of Court is **DIRECTED** to **CLOSE** this case.

SO ORDERED this *17th* day of March, 2008.

WILLIAM T. MOORE, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA